# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ELAINE HARRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:11-CV-2446-VEH** |
| | ) | |
| **UAB HEALTH SYSTEM,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION

THIS CAUSE is before the court on Defendant's Motion for Summary Judgment (Doc. 47) (the "Motion") filed on November 16, 2012. Plaintiff responded on December 6, 2012. (Doc. 51.) Defendant replied on December 20, 2012. (Doc. 53.) The Motion is now ripe for disposition.

## I.    BACKGROUND

### A.    Facts

From 1978 to 2004, Plaintiff Elaine Harris (black female, 61) ("Harris") worked as a Licensed Practical Nurse ("LPN") for the University of Alabama Birmingham. In 2004, Harris retired and immediately went to work for the Defendant, the UAB Health System (the "System") in its Addiction Recovery Program ("ARP"). The ARP is part of the Center for Psychiatric Medicine at

University Hospital.  Harris was a full-time employee.

The ARP has two components: a clinical side, staffed with counselors, and a medical side, staffed with nurses and Patient Care Technicians.  When Harris started work at the ARP, Dawn Hamby (white female, 56) ("Hamby"), a UAB employee, was managing the medical side of the ARP.  Hazel Woodward (white female, 61) ("Woodward"), an exempt, salaried UAB employee, was the Program Manager for the ARP.  Because Hamby and Woodward worked for UAB, not the System, the System had no control over their pay.  (Doc. 48-7 at 2, ¶ 3.)  Both Hamby and Woodward reported to Charmaine Prosch (white female, 59), the Administrative Director of Psychiatric Services.  Later, both Patrice Jones (white female, 58) and Steve Nasiatka (white male, 53) occupied this position.  The Administrative Director reported to Deborah McGrew (white female, 37), an Associate Vice President.

Hamby is a Registered Nurse ("RN").  As the manager of the ARP's medical staff, Hamby performed patient assessments, supervised the LPNs, prepared schedules, assigned patients, divided duties among staff members, kept up with employee time and attendance, and administered evaluations and discipline.  Hamby also performed some duties of a nurse manager, including attending department meetings and safety classes.  For her work, Hamby received regular RN pay of $28.44 an hour, a Charge Nurse premium of $1.00 an hour, and "on call" pay of $1.50 an

hour.  Hamby also had an office on the fourth floor.  In February 2007, Hamby resigned from her position and went to work for the University of Alabama Health Services Foundation.

Upon Hamby's resignation, Prosch approached Harris about taking over Hamby's role in the ARP.  Prosch told Harris she would get Hamby's office, her beeper, her keys, would be on call, and would manage LPNs and PCTs.  Harris replied that she would need an increase in pay to correspond with the increase in responsibilities.  Prosch said that there was no money for a pay increase.

Nonetheless, Harris assumed Hamby's role in the ARP.  Her duties were substantially similar to those performed by Hamby.  (*See* Doc. 48-1 at 20–21.)  Harris did not perform patient assessments, something Hamby had done.  However, Harris did supervise PCTs, something Hamby had not done.  In her new role, Harris received her LPN pay of $19.19 an hour, a Charge Nurse premium of $1.00 an hour, and "on call" pay of $1.50 an hour.  Harris also got Hamby's office on the fourth floor.

In 2008, Prosch left the System.  Just before she left, Harris approached her about a raise.  Prosch told her she could not do anything because she was leaving.  After Prosch left, Patrice Jones became the interim Administrative Director.  Harris also approached her about a raise, and she said that she would look into it.  Just before Jones stepped down from this position in August 2008, she promised to talk

to Nasiatka, the incoming Administrative Director, about Harris's pay.

Prior to becoming the Administrative Director, Nasiatka conducted a computer software training session for the LPNs in the ARP, including Harris. During this training, Nasiatka commented that the LPNs should buy the book "Computer for Dummies." (Doc. 48-1 at 39.)

After Nasiatka became Administrative Director, he met with Harris several times to discuss how the ARP operated. As Harris explained, "[Nasiatka] would drill me and drill me for hours about how the program functioned—how it functioned, why it functioned that way, et cetera, et cetera, et cetera. He would really, really—I don't know if he was trying to learn how to run the [ARP] and that was his method because he knew nothing about it, but the process he used, five hours a day sitting with anybody is no fun, and especially with a harsh person." (Doc. 48-1 at 57.)

Additionally, Nasiatka made comments about Harris's status as a retired employee. He referred to her and other retired employees as "double dippers" and said they were trying to have their cake and eat it too. (Doc.48-1 at 40.)

Harris twice approached Nasiatka about a raise. Both times, Nasiatka brushed her off, saying there was no money for a raise at that time.

In May 2009, McGrew assumed responsibility for the Center for Psychiatric Medicine, which includes the ARP. She learned that the ARP was losing $1.2 million

4

a year and was not operating within its budget.  McGrew and Nasiatka began assessing the ARP's financial situation, with Nasiatka focused on staffing.

At the same time, Navigant, an outside consulting firm, was conducting an assessment of University Hospital's overall operations, including staffing.  (Doc. 49 at 11, ¶ 33; Doc. 48-5 at 2, ¶ 6.)  Navigant issued its report in the summer of 2009. (Doc. 49 at 11, ¶ 33; Doc. 48-1 at 25.)  The Navigant Report recommended that the Center for Psychiatric Medicine eliminate three full time employees.  The Navigant Report further concluded that the clinical side of the ARP was overstaffed but that the medical side of the ARP was staffed appropriately.  McGrew's boss told her that she must cut three employees, but gave her some time to "fully assess the situation." (Doc. 48-5 at 2, ¶ 6.)

McGrew and Nasiatka contend that the Navigant Report was not accurate because it did not account for the way the ARP actually operates.[1]  Further, Nasiatka contends that the use of employees working overtime shifts (as well as employees from a float pool) created significant cost overruns on the medical side of the ARP. (Doc. 48-6 at 5, ¶ 11–12.)  Based on Nasiatka's analysis, he and McGrew decided to reorganize the medical side of the ARP.

---

[1]  The court has already denied Harris's motion to strike McGrew and Nasiatka's testimony regarding the Navigant Report.  (Doc. 57.)

As part of this reorganization, they moved Harris from a management position to a floor nurse position, eliminated her "on call" pay, and limited overtime for the ARP's medical staff. (Doc. 48-6 at 5, ¶ 11–12.) Nasiatka transferred Harris's "on call" duties to Woodward, a salaried employee. By eliminating Harris's "on call" pay, Nasiatka saved the ARP over $10,000. The reorganization did not eliminate any full time employees in the ARP. Thus, before and after the reorganization, the ARP had five LPNs—two white and three black. However, the ARP did not replace employees who retired or resigned. After the reorganization, Harris kept her Charge Nurse designation and her Charge Nurse premium of $1.00 an hour.

In September 2009, Nasiatka and Woodward told Harris about the reorganization. They explained the change in her duties and asked her to turn in her pager. Harris then said, "I see two white people trying to bring down a black woman." (Doc. 48-1 at 60.) Nasiatka told Harris she should talk to Human Resources. (*Id.*)

About six weeks after Nasiatka moved Harris to the floor nurse position, Nasiatka told her to move out of her office on the fourth floor. Nasiatka contends that he and McGrew had made this decision when they decided to move Harris to a floor nurse position. However, he did not immediately implement the decision because he wanted to give Harris time to adjust to her new position.

6

Harris moved her office to a room on the second floor which had an attached restroom used for urine drug screens.  Harris asked Nasiatka and Woodward to use a different room that was being used as a storage closet.  (Doc. 48-1 at 44.)  They refused her request.

In November 2009, Nasiatka came to a nurse's station (presumably on the second floor) and yelled at Harris in front of several other staff members.  Specifically, Nasiatka told Harris to stay out of management's business.  (Doc. 48-1 at 34.)

On February 2, 2010, Harris filed a charge of discrimination with the EEOC alleging race, sex, and age discrimination as well as retaliation.  The EEOC issued Harris a right-to-sue letter in April 2011.  Harris timely filed her complaint on July 5, 2011.

In November 2011, Harris was injured at work.  She saw a doctor who cleared her to return to work with restrictions the next day.  However, Harris believed the doctor had put her off work for about a week.  Harris did not report to work the next day, and, as a result, she received a verbal reprimand.  This reprimand did not affect Harris's salary, benefits, or terms and conditions of employment.  (Doc. 49 at 16–17, ¶ 54.)  However, Harris did receive a low performance review for 2011.  Prior to 2011, Harris received only excellent performance reviews.

7

B.    Procedure

Harris initially alleged eight claims against both the Defendant, the UAB
Health System, and the Board of Trustees of the University of Alabama.   In its
Memorandum Opinion of February 27, 2012, this court described Harris's claims as:

(1)    Race discrimination (based on unequal pay, hostile work environment,
and disparate impact) under Title VII of the Civil Rights Act of 1964, as
amended, 42 U.S.C. § 2000e *et seq.* ("Title VII");

(2)    Retaliation under Title VII;

(3)    Retaliation under 42 U.S.C. § 1981, brought by and through 42 U.S.C.
§ 1983;

(4)    Violation of the Equal Protection Clause of the Fourteenth Amendment
of the United States Constitution, brought by and through § 1983;

(5)    Age discrimination under the Age Discrimination in Employment Act
("ADEA"), 29 U.S.C. § 621 *et seq.*;

(6)    Breach of contract under state law;

(7)    Quantum Meruit under state law; and

(8)    Attorneys Fees under 42 U.S.C. § 1988.

(Doc. 26 at 4.)  Both the System and the Board of Trustees moved to dismiss Harris's
claims.  (Docs. 13 & 14.)  The court granted the Board's motion, and dismissed all
Harris's claims against it. (Doc.  27.)  As a result, the court directed the clerk to
terminate the Board as a defendant.  On the other hand, the court denied the System's

8

motion in part.  While the court dismissed Harris's § 1981 and Equal Protection claims against the System, it allowed Harris's other claims to proceed to discovery. (Doc. 29.)

Now, the System has moved for summary judgment on Harris's surviving claims.  To resolve the Motion, the court must address the following five claims: (1) race discrimination under Title VII; (2) retaliation under Title VII; (3) age discrimination under the ADEA; (4) breach of implied contract; and (5) quantum meruit.[2]  The court will address each in turn.

## II.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R .Civ. P. 56(a).  "All reasonable doubts about the facts" and "all justifiable inferences" are resolved in favor of the nonmoving party.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).[3]  A dispute is genuine "if the evidence is such that a

---

[2] Because Harris's claims fail on the merits, the court will not address Harris's claim for attorney's fees.

[3] Rule 56 was amended in 2010. The Advisory Committee was careful to note, however, that "[t]he standard for granting summary judgment remains unchanged."  Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments.  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*  The substantive law will identify which facts are material and which are irrelevant.  *Id.*

The summary judgment analysis varies somewhat depending on which party bears the burden of proof at trial.  *See Fitzpatrick*, 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party would bear the burden of proof on an issue, then it may meet its burden on summary judgment only by presenting positive evidence demonstrating an absence of a genuine issue of material fact—i.e., facts that would entitle it to a directed verdict if not controverted at trial.  *Id.* at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.  *Id.*

If the nonmoving party would bear the burden of proof on an issue at trial, then the moving party can satisfy its initial burden on summary judgment in either of two ways.  *Id.* at 1115–16.  First, the moving party may produce affirmative evidence negating a material fact, thereby demonstrating that the nonmoving party will be unable to prove its case at trial.  *Id.* at 1116.  If the moving party produces such

10

evidence, then the nonmoving party must respond with positive evidence sufficient to defeat a motion for a directed verdict at trial. *Id.*

Second, the moving party may affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on a material element. *Id.* The moving party is not required to produce evidence negating its opponent's claim, but it must direct the court to the hole in the nonmoving party's case. *Id.* at 1115–16. If the moving party satisfies this burden, the nonmoving party may either point to evidence in the record which would sustain a judgment at trial, or may also come forward with additional evidence which would sustain a judgment. *Id.* at 1116–17. The nonmoving party cannot simply rest on mere allegations; he must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358, 116 S. Ct. 2174, 2183 (1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136–37 (1992)).

**B.    *McDonnell Douglas* Burden Shifting Framework, Generally**

Under Title VII, a plaintiff may attempt to show unlawful discrimination in any of "three ways: [1] by presenting direct evidence of discriminatory intent; [2] by meeting the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973); or [3] by demonstrating through statistics a pattern of discrimination." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.

1990). The second method, the now familiar *McDonnell Douglas* burden shifting

framework, is particularly relevant here. The court will introduce it by quoting the

Eleventh Circuit:

> Under *McDonnell Douglas,* a plaintiff must first establish a prima facie case of discrimination, which "in effect creates a presumption that the employer unlawfully discriminated against the employee." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981). [The precise elements of a prima facie case vary depending on the type of discrimination alleged.]
>
> Once the plaintiff establishes a prima facie case of [unlawful] discrimination, the burden shifts to the employer to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *See McDonnell Douglas,* 411 U.S. at 802–03, 93 S. Ct. 1817. "This burden is one of production, not persuasion . . . ." *Reeves,* 530 U.S. at 142, 120 S. Ct. 2097. Thus, "[t]o satisfy that burden of production, '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997) (quoting *Burdine,* 450 U.S. at 254–55, 101 S. Ct. 1089). If the employer produces evidence of a legitimate, nondiscriminatory reason for the adverse action, the plaintiff is afforded an opportunity to show that the employer's stated reason is a pretext for discrimination. *See, e.g.*, *Reeves,* 530 U.S. at 143, 120 S. Ct. 2097; *McDonnell Douglas,* 411 U.S. at 804, 93 S. Ct. 1817.
>
> The plaintiff can show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S. Ct. 1089. "In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the

prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs,* 106 F.3d at 1528. If a plaintiff produces sufficient evidence that the employer's proffered reason is merely pretextual, that evidence may sometimes be enough to preclude summary judgment in favor of the employer. *See Reeves,* 530 U.S. at 148, 120 S. Ct. 2097. *See also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed.2d 407 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.").

*Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308–09 (11th Cir. 2012) (footnote omitted).

"The prima facie case method established in *McDonnell Douglas* was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 1482 (1983) (internal quotation marks and citation omitted); *see Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

## III.   ANALYSIS

### A.   Race Discrimination

Harris alleges three ways that the System discriminated against her on account of her race.  First, she contends that the System refused to pay her equally with white employees.  Second, she contends that the System treated her less favorably than

white employees.  Third, she contends that the System's reorganization of the ARP had a disparate impact on African Americans.  For the reasons that follow, each of these claims fail.

Initially, the court notes that Harris has not offered any direct evidence of race discrimination.  (Doc. 51 at 19–25.)  In fact, Harris testified that she never heard any of her supervisors—Charmaine Prosch, Steve Nasiatka, or Deborah McGrew—use racial language or epithets.  (Doc. 48-1 at 40, 49.)  Nor does she have any second hand accounts of these individuals using racial language or epithets.  (*Id.*)  Because Plaintiff offers no direct evidence of race discrimination, the court will analyze these claims under the *McDonnell Douglas* burden shifting framework.

    1.   <u>Unequal Pay Claim</u>

    a.   *Prima Facie Case*

To establish a prima facie case on an unequal pay claim under Title VII, a plaintiff must show that (1) she is a member of a protected group, (2) she received low wages, (3) similarly situated persons outside the protected group received higher wages, and (4) she was qualified to receive the higher wages.  *See, e.g.*, *Cooper v. Southern Co.*, 390 F.3d 695, 735 (11th Cir. 2004) (citation omitted), *overruled on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457, 126 S. Ct. 1195, 1197 (2006); *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir.

1992); *MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 774 (11th Cir. 1991) (discussing the prima facie case in the age discrimination context) (citation omitted); *White v. ThyssenKrupp Steel USA, LLC*, 743 F. Supp. 2d 1340, 1344 (S.D. Ala. 2010); *see also* Doc. 51 at 21 (citing *Cooper v. Southern Co.*, 390 F.3d 695, 735 (11th Cir. 2004)).

This formulation of the prima facie case is not without criticism. For example, Chief Judge William H. Steele of the Southern District of Alabama, in *White v. ThyssenKrupp Steel USA, LLC*, concludes that the fourth element—that a plaintiff be qualified to receive higher wages—is not part of the prima facie case. Judge Steele notes that, in *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 598 (11th Cir. 1994), the Eleventh Circuit did not require the plaintiff to establish the fourth element to make out a prima facie case. Instead, the court required the plaintiff to show only: (1) that she was a member of a protected class, and (2) that her job was substantially similar to higher paying jobs occupied by members outside the protected class. *See White*, 743 F. Supp. 2d at 1350–51 (referencing *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586 (11th Cir. 1994)). Judge Steele further notes that *Mulhall*'s formulation of the prima facie case is its holding, and that *Mulhall* predates other cases which include the

15

fourth element.[4]   *Id.*   Thus, Judge Steele concludes that, under the prior panel precedent rule, the fourth element is not part of the prima facie case for an unequal pay claim under Title VII.   *See id.* at 1347–48.

Nonetheless, the plaintiff in *White* had conceded that all four elements are part of the prima facie case.   *White*, F. Supp. 2d at 1350–51.   Therefore, Judge Steele analyzed the plaintiff's claim under the standard set forth above.   Harris has done the same thing as the plaintiff in *White*.   In her Response, Harris says that she must show "that (1) she belongs to a racial minority, (2) [s]he received low wages, (3) similarly situated comparators outside the protected class received higher wages, and (4) she was qualified to receive the higher wage."   (Doc. 51 at 21) (citing *Cooper*, 390 F.3d at 735).   Thus, the court will use Harris's formulation of the prima facie case.

Turning to the merits of Harris's prima facie case, the first element is easily met.   Harris is an African American female.   The court assumes the second element is also met.   Harris was paid approximately ten dollars less than Hamby, her predecessor.

       I.      Third Element—Plaintiff is similarly situated to a person outside the protected class.

---

[4] Judge Steele suggests that the Eleventh Circuit purported to add the fourth element in *Cooper v. Southern Co.*, 390 F.3d 695 (11th Cir. 2004).   *See White*, 743 F. Supp. 2d at 1347. However, *Cooper* postdates *Mulhall* by a decade.

Harris cannot meet the third element—that a similarly situated person outside her protected class received higher wages.  For an unequal pay claim, "[t]he standard for 'similarity' in Title VII cases is relaxed."  *See Mulhall*, 19 F.3d at 598 (citing *Miranda*, 975 F.2d at 1529)).   A plaintiff only need show that her job was "substantially similar to higher paying jobs occupied" by individuals outside the protected class.  *Id.*  Such individuals are frequently called comparators.

The parties have identified two potential comparators: Hamby and Woodward. As discussed below, the parties hotly dispute whether Harris's job is substantially similar to either of these comparators.  However, the court need not go that far.  It is undisputed that both Hamby and Woodward were employed by the University of Alabama Birmingham.  (Doc. 49 at 4–5, ¶ 6–7.)  Neither women were employed by the UAB Health System.  Further, it is not seriously disputed that the System did not set Hamby and Woodward's pay.  (Doc. 49 at 22; Doc. 48-7 at 2, ¶ 3.)  Because Hamby and Woodward worked for a different employer than Harris, they are not similarly situated for purposes of Title VII.

But, assuming that Harris could get past the different employer problem, the court would conclude that Harris is similarly situated to Hamby.  Harris replaced Hamby (Doc. 51 at 13, ¶ 4), and her duties were substantially similar to Hamby's duties (Doc. 48-4 at 2, ¶ 8; Doc. 48-1 at 20).

The System contends that Harris's and Hamby's jobs were different. This contention rests exclusively on the fact that Hamby performed patient assessments while Harris did not.  (Doc. 49 at 22; Doc. 48-4 at 2, ¶ 7–8; Doc. 48-1 at 20.) However, the significance of this distinction is unclear.  The record does not say whether patient assessments was a central component of Hamby's job, or whether it was a relatively minor one.  Without evidence either way, the court will not speculate. And, given the relaxed standard of similarity, the court concludes that Harris was similarly situated to Hamby.

The court reaches the opposite conclusion with Woodward.  First, Harris does not even attempt to compare her job to Woodward's job.  Therefore, Harris has waived this issue.  But, even if Harris had not waived this issue, the court would reach the same conclusion.  It is undisputed that Woodward's job involved "promoting and marketing the ARP, acting as a program liaison with various professional boards, insuring regulatory compliance, and creating and managing the budget."  (Doc. 49 at 5, ¶ 7; Doc. 48-6 at 2, ¶ 3.)  These duties are substantially different from Harris's duties.

        ii.    Fourth Element—Plaintiff  is qualified to receive higher wages

Assuming that Harris could show that she was similarly situated to Hamby, she

has not established the fourth element of her prima facie case.  It is undisputed that Harris and Hamby have different educational backgrounds and licenses.  Specifically, Hamby is an RN and Harris is an LPN.  And, Harris admits that RNs are usually paid more than LPNs.  (Doc. 48-1 at 20.)[5]

Harris offers two reasons that Hamby's superior qualifications do not justify higher pay.  First, Harris contends that the System put Harris in Hamby's job, and, therefore, it is estopped from questioning her qualifications.  (Doc. 51 at 22.)  If the issue was whether or not Harris is qualified to do Hamby's job, this argument might hold some weight.  But that is not the issue.  The issue is whether Harris has shown she was entitled to receive Hamby's wages.  Harris offers no evidence  to show that someone with her education and licenses is entitled to the same pay as an RN like Hamby.  Additionally, Harris offers no evidence showing that the System does not

---

[5]  Specifically, Harris testified that:

Q:      And you said you know [Hamby] made more money than you did?

A:      Yes, I'm sure she did.

Q:      And why are you sure?

A:      Because she's an RN.

Q:      Okay.  And RNs are typically paid more than LPNs?

A:      Yes, ma'am.

(Doc. 48-1 at 20.)

set its employees' pay based on their education and licenses.  (Doc. 48-7 at 2, ¶ 3.)

In fact, Harris's own testimony refutes any such allegation.  (Doc. 48-1 at 20.)  As an

LPN, Harris was simply not entitled to the same pay as Hamby, an RN.  The fact that

they were performing substantially the same duties does not matter.

Harris's second counter argument also fails.  She contends that, with one

exception, she received excellent performance reviews.  (Doc. 51 at 22.)  This

argument boils down to an accusation of "that's not fair."  It may not be fair, but Title

VII does not transform this court into a "super personnel department."  *Lee v. GTE

Fla., Inc.*, 226 F.3d 1249, 1254 (11th Cir.  2000) (citation omitted). Instead, Title VII

authorizes this court "to [stop] unlawful hiring practices," such as discrimination

based on race.  *Id.*  Treating an employee unfairly (while not condoned) is not an

unlawful employment practice under Title VII.

b.    *Legitimate Nondiscriminatory Reason*

Assuming that Harris could somehow establish a prima facie case on her

unequal pay claim, the burden would shift to the System to produce a legitimate,

nondiscriminatory reason for the difference in Harris's pay.  In this context, "the

defendant's burden in rebutting the prima facie case is 'exceedingly light.'"  *Mulhall*,

19 F.3d at 586 (quoting *Perryman v. Johnson Prods., Co.*, 698 F.2d 1138, 1142 (11th

Cir. 1983)).  Here, the System contends that Harris's pay was lower because Harris

was an LPN and Hamby was an RN.  This articulated reason shifts the burden back to Harris.

        c.     *Pretext*

Harris has not shown that the System's legitimate, nondiscriminatory reason was merely a pretext for discrimination.  Her own testimony establishes that RNs are typically paid more than LPNs.  (Doc. 48-1 at 20.)  Thus, the difference between her pay and Hamby's pay does not support an inference of race discrimination.

Nor has Harris produced other circumstantial evidence to support her claim. For example, Harris never heard Prosch, Nasiatka, or McGrew use racial language or epithets.  (Doc. 48-1 at 40, 49.)  The primary reason Harris believes these individuals dislike African Americans is the way they responded to her complaints about her pay. As Harris put it, "[Y]ou can tell when somebody is treating you a certain way, you know, kind of overlooking what you're trying to tell them or express to them, it just, it's not important.  That's the feeling I would get."  (Doc. 48-1 at 40.)  That Harris "felt" treated "a certain way" is not enough to infer pretext here.

Harris fails to make out a prima facie case of race discrimination regarding her pay.  And, even if she could make out a prima facie case, she has not shown pretext. Therefore, the Motion is due to be **GRANTED** on Harris's equal pay claims.

        2.     <u>Terms and Conditions of Harris's Employment</u>

Harris next contends that the System altered the terms and conditions of her employment because of her race.  To establish a prima facie case of disparate treatment based on race, "a plaintiff must generally show that (1) [she] is a member of a protected class; (2) [she] suffered an adverse employment action; (3) the employer treated similarly situated employees outside of the protected class more favorably; and (4) [she] was qualified to do the job." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002) (citation omitted).

An adverse employment action is one which "in some substantial way, alter[s] the employee's compensation, terms, conditions, or privileges of employment, deprive[s] . . . her of employment opportunities, or adversely affect[s] . . . her status as an employee." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (internal quotation marks and citations omitted).

Here, Harris argues that she suffered two adverse employment actions: (1) a demotion and (2) the additional duties assigned to her after Hamby's departure.  The court will address each in turn.

a.    *Demotion*

I.    Prima Facie Case

The reorganization of the ARP substantially changed Harris's job duties.  She lost her management position and began working as a floor nurse.  (Doc. 51 at 14,

22

¶ 11; Doc. 49 at 11, ¶ 36.)  Additionally, she lost her on-call pay, was restricted from

working overtime, and lost her office.[6]  Although Harris does not expressly label this

event a demotion, the court will treat it as a demotion.  Thus, Harris has established

the first two elements of her prima facie case.  Similarly, Harris has established the

fourth element of her prima facie case—that she was qualified to do the job.  The

System offered Harris Hamby's role in the ARP, and she successfully performed in

this role for over two years.  Therefore, the System cannot seriously (and in fact does

not attempt to) dispute that Harris was qualified for her job.

Rather, the System contends that Harris cannot establish a prima facie case

because "as the only charge nurse, she cannot identify a similarly situated comparator

who was treated more favorably."  (Doc. 49 at 24.)  The court rejects the System's

argument.  Because Harris was "the only charge nurse," she cannot possibly show

that another similarly situated charge nurse was treated more favorably.  And, given

Harris's evidence that she was paid less than the previous charge nurse, Hamby, the

court will assume, for purposes of summary judgment, that Harris has established the

third element of her prima facie case.

ii.     Legitimate Nondiscriminatory Reason

Because the court assumes that Harris has a prima facie case of discrimination

_____

[6]  Harris kept her base pay and her charge nurse premium. (Doc. 49 at 13, ¶ 42.)

related to her demotion, the System must articulate a legitimate, nondiscriminatory reason for its decision.  The System maintains that the ARP was losing 1.2 million dollars a year.[7]  (Doc. 49 at 10, ¶ 31.)  It reorganized the ARP to save money.  (See Doc. 48-6 at 6, ¶ 14.)  In particular, McGrew and Nasiatka decided to move Harris to a floor nurse position to reduce staffing costs.  (*Id.*)  They eliminated her on-call pay, which alone saved the ARP approximately $10,000.  (Doc. 28-6 at 6–7, ¶¶ 13, 14.) Nasiatka transferred the on-call duties to Woodward, a salaried employee. (Doc. 48-6 at 5, ¶ 13.)  Additionally, Nasiatka restricted overtime for everyone on the medical side of the ARP, not just Harris. (*See* Doc. 48-6 at 6–7, ¶¶ 12, 14.)  It is not seriously disputed that this action was designed to significantly reduce staffing costs in the ARP, though the record does not disclose how much.  (*Id.*)  Finally, because Harris was working as a floor nurse, she no longer needed an office.  (Doc. 48-6 at 8, ¶ 22.) These articulated reasons are sufficient to shift the burden back to Harris.

### iii.    Pretext

---

[7]  In her Response, Harris disputes that the ARP was losing more than 1.2 million dollars a year. (Doc. 51 at 7, ¶ 31.)  However, the basis for Harris's dispute is that the System failed to produce the Navigant Report during discovery.  Thus, Harris moved to strike McGrew and Nasiatka's  testimony regarding the financial health of the ARP.  (Doc. 50.)  This court denied Harris's Motion to Strike.  (Doc. 57.)  Therefore, Harris cannot dispute that the ARP was losing money based on her Motion to Strike.

Harris further contends that McGrew and Nasiatka's testimony is inadmissible hearsay. (Doc. 51 at 7, ¶ 31.)  However, McGrew and Nasiatka certainly have personal knowledge of what they observed regarding the ARP's financial health.

Harris has not shown pretext.  She has not seriously disputed that the ARP was losing money.  (*See* note 7 *supra*.)  Additionally, Harris has not shown that the decision to reorganize the medical side of the ARP was anything more than a poor business decision.

Harris points out that the Navigant Report concluded the ARP was overstaffed on the clinical side, not the medical side.  She contends Nasiatka and McGrew should have cut clinical staff rather than medical staff. (Doc. 48-1 at 46.)   Yet, the reorganization did not cut any staff members on either side of the ARP.  Nasiatka avers that he "did not furlough any regular, full time employees in the ARP as a result of the reorganization, although we did reduce staff somewhat by attrition." (Doc. 48-6 at 6, ¶ 14.)  Moreover, Nasiatka avers that the ARP had exactly five (5) LPNs before the reorganization and exactly five (5) LPNs after the reorganization.  (Doc. 49 at 12, ¶ 38; Doc. 48-6 at 6–7, ¶¶ 14, 17.) Harris disputes this fact, but the testimony she cites actually confirms Nasiatka's version of events.  (*See* Doc. 51 at 8, ¶38; Doc. 48-1 at 46–47.)  The nurse that Harris alleges "lost" her job merely retired and was not brought on after her retirement.  (Doc. 48-1 at 46.)  Because the reorganization did not cut any full time staff members, the Navigant Report does not demonstrate pretext; it merely shows that Nasiatka and McGrew did not follow its recommendations.

Furthermore, Harris has not shown that the reorganization was not designed to significantly reduce staffing costs in the ARP. Nasiatka explained that the medical side of the ARP was using too many overtime shifts and unnecessarily drawing on float pool employees. To correct this problem, Nasiatka moved Harris to a floor nurse position and restricted overtime for the medical staff. (Doc. 48-6 at 5–6, ¶ 11–14.) Harris has not seriously disputed Nasiatka's testimony.

Finally, Harris has no other evidence to support an inference of race discrimination related to her demotion. Because Harris has not shown pretext, the Motion is due to be **GRANTED** on Harris's race discrimination claim related to her demotion.

> b. *Additional Duties*

Harris further contends that she had to perform several duties in addition to those performed by Hamby, such as managing Patient Care Technicians. (Doc. 51 at 23.) She contends that these additional duties constitute an adverse employment action. Assuming that the assignment of these additional duties to Harris constitutes an adverse employment action (something the court doubts), Harris's claim would still fail. Harris began performing these duties when she assumed Hamby's role in the ARP. Harris has not shown that other employees were not assigned additional duties upon assuming a new position.

3.   <u>Disparate Impact</u>

Finally, Harris contends that the reorganization had a disparate impact on African Americans.  The "disparate impact theory prohibits *neutral* employment practices which, while non-discriminatory on their face, visit an adverse, disproportionate impact on a statutorily-protected group." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274 (11th Cir. 2000) (citation omitted).  To establish a disparate impact claim, a plaintiff must show (1) a "significant statistical disparity between" the protected group and the nonprotected group, (2) "that there is a specific, facially-neutral, employment practice which is the alleged cause of the disparity," and (3) that "a causal nexus exists between the specific employment practice identified and the statistical disparity shown." *Id.* (discussing these elements in the gender discrimination context).  The third element requires "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994, 108 S. Ct. 2777, 2789 (1988).

Here, Harris cannot establish the first or third elements of a disparate impact claim.  First, she has not shown a significant statistical disparity between African Americans and non-African Americans in the staffing of the ARP.  In fact, the record

shows that no one lost their job because of the reorganization.  *See* Part III.A.2.a.iii *supra*.  And, even though the reorganization adversely affected Harris and three other African American nurses, this number is simply too small to demonstrate a significant statistical disparity.

Second, Harris has not produced statistical evidence which shows the reorganization adversely affected African Americans *because they are African American*.  In fact, the record shows that the reorganization impacted the ARP's white and black medical staff equally.[8]  Thus, the only reasonably inference is that the reorganization impacted the African American medical staff members because they were medical staff members, not because they were African American.

Admittedly, the reorganization impacted more African American staff members than white staff members.  As Harris points out, only one out of the ten clinical staff members was black whereas three of the five LPNs were black.  Because the reorganization did not affect the clinical staff, Harris contends that it adversely affected African Americans.  Essentially, Harris contends that the System decided to reorganize the medical staff rather than the clinical staff because of race.  This contention is actually a disparate treatment argument, not a disparate impact argument. Nonetheless, this argument still fails because Harris has not shown that the

---

[8]  The other two LPNs were white.  (Doc. 48-6 at 6-7, ¶ 17.)

reorganization was a pretext for discrimination.  *See* Section III.A.2.a.ii. & iii.

For the foregoing reasons, the Motion is due to be **GRANTED** as to Harris's disparate impact claim.

### B.    Retaliation

Harris next contends that the System retaliated against her.  Title VII prohibits employers from discriminating against an employee because she has opposed an unlawful employment practice.  *See* 42 U.S.C. § 2000e-3(a).  As with her race discrimination claims, Harris has no direct evidence of retaliation.  Therefore, the court will analyze Harris's claims under the *McDonnell Douglas* burden shifting framework.

To make out a prima facie case of retaliation, Harris must show that "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir.2001)).  For a retaliation claim, an adverse employment action means an action which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Crawford*, 529 F.3d at 974 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2006)).  To show

a causal connection, a plaintiff must at least show that the decision maker was aware of the protected conduct. *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000), *overruled on other grounds*, *Burlington*, 548 U.S. at 68, 126 S. Ct. at 2415. Additionally, a plaintiff must show that the protected conduct and the adverse action were "not wholly unrelated." *Id.* (citation omitted). "For purposes of a prima facie case, close temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated." *Id.* (internal quotation marks and citation omitted). However, when a plaintiff relies on temporal proximity alone, the proximity must be "very close." *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511 (2001) (citation omitted).

Here, Harris has identified two activities which she claims are protected under Title VII: (1) her complaints about her unequal pay and (2) her allegations of race discrimination. The court will address each in turn.

### 1.   Complaints about Unequal Pay

Harris contends that she frequently complained about her pay to her supervisors beginning in 2007. (*See* Doc. 48-1 at 17.) However, Title VII does not protect an employee's <u>general</u> complaints about her pay. *See Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007–08 (7th Cir. 2000). Instead, an employee's complaints must at least mention or suggest that her protected status is at issue. *Id.*

30

at 1008.

Nothing in the record suggests that Harris linked her complaints about unequal pay to her race before September 2009.  (*See* Doc. 48-1 at 60.)  In fact, the only instance in the record where Harris told her supervisors that race was an issue occurred in 2009.  (Doc. 48-1 at 60.)  Thus, Harris's complaints about her pay cannot support a retaliation claim.

2.   <u>Harris's Statement to Nasiatka and Woodward</u>

In September 2009, Harris met with Nasiatka and Woodward.  At this meeting, Nasiatka informed Harris that she would return to a floor nurse position.  Upon learning this information, Harris said, "I see two white people trying to bring down a black woman."  (Doc. 48-1 at 60.)  Assuming without deciding that Harris's statement constitutes protected activity, the court will proceed to the second and third elements of Harris's prima facie case.

Here, the parties have identified four potential adverse employment actions: (1) Harris's demotion, (2) Harris's loss of her office, (3) Harris's verbal reprimand in November 2011, and (4) the handling of Harris's worker's compensation case.  The first action clearly fails.  The decision to return Harris to a floor nurse position is what prompted her to comment that she saw "two white people trying to bring down a black woman."  Because Harris's demotion occurred before her protected activity, it

31

cannot constitute retaliation.

Similarly, any retaliation claim based on Harris's verbal reprimand and the handling of her worker's compensation case also fails.  These events occurred over two years after her statement to Nasiatka and Woodward.  Therefore, these actions are far too remote in time to sustain a retaliation claim.[9]

The court reaches a different conclusion regarding Harris's loss of her office. The loss of an office might dissuade a reasonable employee from making a charge of discrimination.  Further, this action is not so temporally remote as to be wholly unrelated.  It occurred between six and eight weeks after Harris's complaint to Nasiatka and Woodward.  (Doc. 49 at 15, ¶ 50.)  Because Harris has made out a prima facie case of retaliation regarding the loss of her office, the burden shifts to the System to produce a legitimate, nondiscriminatory reason for its decision.  *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010) (citation omitted).

The System contends that Nasiatka and McGrew had already decided to take away Harris's office when they informed Harris about her demotion.  (Doc. 49 at 26–27;  Doc. 48-6 at 8, ¶ 22.)  Nasiatka contends he made this decision because he

---

[9] And, even if the court were to measure the temporal proximity of Harris's reprimand from the filing of her EEOC complaint (February 2, 2010) or the filing of this lawsuit (July 5, 2011), the court would conclude the reprimand was too temporally remote to establish a causal connection.

32

and McGrew "wanted [Harris] to be working on the floor with patients and providing leadership to the other LPNs" and because "the CPM needed [Harris's office] for a social worker." (*Id.*) Nasiatka further contends that he delayed implementing his decision "to give [Harris] an opportunity to adjust" to the changes in her job. (Doc. 48-6 at 8, ¶ 22.) This articulated reason is enough to shift the burden back to Harris. *See Brown*, 597 F.3d at 1181–82 (citation omitted).

Harris has not shown that the System's articulated reason is false, much less a pretext for unlawful retaliation. Harris admits that she has no evidence to refute the System's legitimate, nondiscriminatory reason for moving her out of her office. (Doc. 51 at 10, ¶ 51.) Instead, Harris contends that Nasiatka moved her to the "pee room," a room on the second floor with an attached bathroom used for urine drug screens. (Doc. 48-1 at 43.) As Harris described it, when the staff needed to do drug screens, "I would be in [my new office] working or doing something , and they'd just go in there and pee while I [was] sitting there." (Doc. 48-1 at 43.) Harris complained about her "new office" and asked to use a storage room on the second floor instead. (Doc. 51 at 26; Doc. 48-1 at 44.) However, Nasiatka and Woodward refused to let her use the storage room as an office. (*Id.*) This allegation is not enough to show pretext here. The System was not required to afford Harris the best room available or retask a room to honor her wishes.

33

Harris has not shown that Nasiatka, McGrew, Woodward, or anyone else connected to the System retaliated against her in violation of Title VII. Therefore, the Motion is due to be **GRANTED** as to Harris's retaliation claims.

## C.     Hostile Work Environment Claim

Harris alleges that Nasiatka created a hostile work environment. To succeed on a hostile work environment claim, an employee must show: "(1) [s]he belongs to a protected group; (2) [s]he was subjected to unwelcome harassment; (3) the harassment was based on [her] membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citation omitted).

Additionally, the Eleventh Circuit has made clear that "not all objectionable conduct or language amounts to discrimination under Title VII." *Jones*, 683 F.3d at 1297 (citing *Reeves v. C. H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (en banc)). "Only conduct that is 'based on' a protected category, such as race, may be considered in a hostile work environment analysis." *Id.* (citing *Gupta*, 212 F.3d at 584). "Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party (the plaintiff), are not counted." *Id.*

34

(citation omitted).

Harris contends that the following actions constitute unwelcome harassment which altered the terms and conditions of her employment:

1.      Nasiatka told Harris and the other LPNs they needed to buy the book "Computer for Dummies."  (Doc. 48-1 at 39.)

2.      Nasiatka subjected Harris to hostile questioning during their meetings about the functioning of the ARP.  (Doc. 48-1 at 57.)

3.      Nasiatka abruptly took Harris off overtime.  (Doc. 48-1 at 133–34, 208.)

4.      Nasiatka screamed at Harris in front of other ARP staff members and said "I told you to stay out of management's business." (Doc. 48-1 at 34.)

(*See* Doc. 51 at 27.)

First, none of these actions have anything to do with Harris's race.  Therefore, these comments do not constitute unwelcome harassment on the basis of race. Second, all but Nasiatka's screaming occurred well before Harris accused Nasiatka and Woodward of "trying to bring down a black woman."  Therefore, these actions cannot be in retaliation for Harris's accusation of race discrimination.  Third, one instance of Nasiatka screaming at Harris is not severe and pervasive harassment such that it altered the terms and conditions of Harris's employment.[10]   Therefore, the

---

[10]  And, even if all four of these events could somehow be lumped together, the court would still find that the harassment was not severe and pervasive enough to alter the terms of Harris's employment.

Motion is due to be **GRANTED** regarding Harris's hostile work environment claim.

### D.    Age Discrimination Claim

As with her race and retaliation claims, Harris has no direct evidence of age discrimination.  Therefore, the court will analyze her age claim under the *McDonnell Douglas* burden shifting framework.  To establish a prima facie case of age discrimination, a plaintiff must show (1) "that she was a member of the protected group of persons between the ages of forty and seventy;" (2) "that she was subject to [an] adverse employment action;" (3) that she was qualified to do the job; and (4) that a younger person  outside the protected age group was treated more favorably. *Kragor*, 702 F.3d at 1308 (citation omitted); *see Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000).

Here, Harris alleges that the System discriminated against her by denying her benefits normally paid to younger employees.  (Doc. 51 at 27–28.)  To support this allegation, Harris submits her 2009 election of benefits form.  (Doc. 52-2 at 6.)  This document alone offers no point of comparison with any younger employee.  Thus, Harris has not shown that she was treated less favorably than substantially younger employees.

Additionally, Harris contends that Nasiatka called her and other older workers "double dippers" and said they wanted to have their cake and eat it too.  (Doc. 48-1

at 40.) While Harris contends these comments are actionable under the ADEA, Harris does not explain how they are actionable or otherwise offer any argument regarding these comments.  Thus, this issue is waived.[11]  *See Cont'l Technical Serv., Inc. v. Rockwell Int'l Corp.*, 927 F.2d 1198, 1199 (11th Cir. 1991); *Rumph v. Astrue*, No. 4:11-CV-3844-VEH, 2013 WL 988006, at * 6 n.3 (N.D. Ala. Mar. 13, 2013) ("The court is not responsible for addressing underdeveloped arguments made by the parties.").

Therefore, the Motion is due to be **GRANTED** as to Harris's age discrimination claim.

### E.    Breach of Contract Claim

Harris contends that the System breached an implied contract to pay her the same as Hamby.  "An implied contract arises where there are circumstances which, according to the ordinary course of dealing and common understanding, show a mutual intent to contract. Such a contract must contain all the elements of an express contract, . . . ." *Broyles v. Brown Eng'g Co.*, 151 So. 2d 767, 770 (Ala. 1963).  Under Alabama law, "[n]o contract is formed without an offer, an acceptance, consideration, and mutual assent to terms essential to the contract.  A contract implied in fact

---

[11]  And, even if Harris has not waived this issue, she has not shown how these comments affected the terms and conditions of her employment.  Therefore, she has not established a prima facie case of age discrimination.

requires the same elements as an express contract." *Steiger v. Huntsville City Bd. of Educ.*, 653 So. 2d 975, 978 (Ala. 1995) (internal citations omitted).

Here, Harris has identified no action by the System which a reasonable person would believe to be an offer to pay Harris what Hamby was making.  In fact, the record shows that the System consistently turned down Harris's requests for a raise.  (*See* Doc. 48-1 at 40; Doc. 52-1 at 4.)  Thus, the Motion is due to be **GRANTED** as to Harris's breach of contract claim.

### F.    Quantum Meruit

Finally, Harris contends that she had a reasonable expectation to be paid what Hamby was making.  "In order to succeed on a claim based on a theory of quantum meruit, the plaintiff must show that [she] had a reasonable expectation of compensation for [her] services.  However, when an express contract exists, an argument based on a quantum meruit recovery in regard to an implied contract fails. The existence of an express contract on a given subject generally excludes an implied agreement on the same subject." *Carroll v. LJC Def. Contracting, Inc.*, 24 So. 3d 448, 459 (Ala. Civ. App. 2009) (internal citations and quotation marks omitted).

Here, the parties have not directed the court to an express employment contract between Harris and the System.  Nonetheless, Harris's quantum meruit claim fails because Harris has not shown that she had a reasonable expectation of compensation

at the same rate as Hamby.  As noted in Section III.E *supra*, the System consistently told Harris it could not pay her equivalent to Hamby.  Therefore, the Motion is due to be **GRANTED** as to Harris's quantum meruit claim.

## IV.   CONCLUSION

For the foregoing reasons, Defendant UAB Health System's Motion for Summary Judgment (Doc. 47) is hereby **GRANTED**.  The court will enter a separate final judgment.  Accordingly, Defendant's Motion to Strike (Doc. 54) is **MOOT**, and the Clerk is **DIRECTED** to **TERM** that motion.

**DONE** and **ORDERED** this the 23rd day of May, 2013.


_____
**VIRGINIA EMERSON HOPKINS**
United States District Judge

39